**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone: (619) 798-2006

**Counsel for Plaintiffs**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

MARIA NELSON and MICHELLE GARZA, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

PLATINUM US DISTRIBUTION, INC.
d/b/a WELLNX LIFE SCIENCES, USA, WELLNX LIFE SCIENCES, INC. and WELLNX LIFE SCIENCES DR, INC.,

Defendants.

Case No:    **'26 CV 0696 GPC BJW**

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

**THE UNFAIR COMPETITION LAW, THE FALSE ADVERTISING LAW, AND THE CONSUMER LEGAL REMEDIES ACT**

**No Jury Demand**

CLASS ACTION COMPLAINT

1
2

## <u>TABLE OF CONTENTS</u>

3

I.     JURISDICTION AND VENUE ........................................................... 1

4

II.    NATURE OF THE ACTION ............................................................. 1

5

III.   PARTIES ................................................................................. 7

6

IV.    REGULATORY BACKGROUND REGARDING UNAPPROVED DRUGS. ....... 8

7

V.     THE SALE OF UNAPPROVED DRUGS LIKE SLIMQUICK POSES A
       GRAVE DANGER TO PUBLIC HEALTH. .......................................... 9

8
9

VI.    THE PURPORTED ACTIVE INGREDIENT IN SLIMQUICK DOES NOT
       CAUSE WEIGHT LOSS ................................................................ 9

10

VII.   DEFENDANTS SELL MULTIPLE UNAPPROVED DRUGS IN A
       UNIFIED ILLEGAL SCHEME. ....................................................... 11

11

       A.    SLIMQUICK PURE EXTRA STRENGTH CAPLETS ............................ 11

12

       B.    SLIMQUICK KETO PILLS ....................................................... 14

13

       C.    SLIMQUICK REGULAR STRENGTH ........................................... 17

14

       D.    SLIMQUICK DRINK MIX ........................................................ 19

15

VIII.  DEFENDANTS' ADVERTISING FOR SLIMQUICK IS FALSE AND
       MISLEADING, RENDERING SLIMQUICK MISBRANDED. ...................... 21

16
17

IX.    SLIMQUICK IS AN UNAPPROVED NEW DRUG. ................................ 22

X.     SLIMQUICK IS DANGEROUS TO CONSUME ..................................... 24

18

XI.    PLAINTIFFS' PURCHASES OF SLIMQUICK ...................................... 25

19

XII.   RELIANCE AND INJURY ............................................................. 26

20

XIII.  DELAYED DISCOVERY .............................................................. 27

21

XIV.   ADDITIONAL TOLLING ALLEGATIONS .......................................... 27

22

XV.    DEFENDANTS' PRACTICES WERE "UNFAIR." .................................. 28

23

XVI.   DEFENDANTS' PRACTICES WERE "UNLAWFUL." .............................. 29

24

XVII.  CLASS ACTION ALLEGATIONS .................................................... 30

25

PRAYER FOR RELIEF ........................................................................ 36

26

XVIII. NO JURY DEMAND .................................................................. 37

27
28

i

Plaintiffs Maria Nelson and Michelle Garza, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby sue Defendants Platinum US Distribution, Inc. d/b/a WellNX Life Sciences USA, WellNX Life Sciences, Inc., and WellNX Life Sciences DR, Inc. (collectively "WellNX" or "Defendants"), and allege as follows:

## I. JURISDICTION AND VENUE

1.    Jurisdiction in federal court is proper under the Class Action Fairness Act because the amount in controversy exceeds $5 million and more than 2/3 of the proposed class reside in states other than those where defendants are citizens.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District; and Defendants (1) are authorized to conduct business in this District, and have intentionally availed themselves of the laws and markets of this District through the distribution and sale of their products in this District; and (2) are subject to personal jurisdiction in this District.

## II. NATURE OF THE ACTION

3.    Defendants manufacture, market, distribute, and sell SlimQuick brand weight loss drugs, including Regular Strength, Extra Strength, Pure Keto, and Drink Mix. Defendants market SlimQuick with specific false efficacy claims, saying the product has a miraculous "fat-burning" ingredient that "increases metabolism," "reduces appetite," "reduces excess water," and results in either "11X" or "3X" more weight loss than dieting without SlimQuick. They also falsely claim that SlimQuick is "made with safe and natural ingredients" and is "not harmful."

4.    Examples of the packaging of SlimQuick are as follows:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





## LOSE UP TO 25 LBS!△*

Slimquick® Pure Keto Extra Strength is the only weight-loss supplement designed specifically to help women lose up to 25 lbs!△*

## KETO SIMPLIFIED™

Slimquick Pure Keto Extra Strength is now formulated with MCT Oil powder. Medium-Chain Triglycerides are fats for your body that can assist you with your ketogenic diet.*

## DESIGNED FOR WOMEN™

Only Slimquick Pure Keto Extra Strength is designed to address the 6 physical reasons women have trouble losing weight.

- Increases METABOLISM*
- Reduces APPETITE*
- Boosts ENERGY*
- Reduces Excess WATER*
- Supports HORMONES*
- Reduces STRESS*

## WHAT IS KETOGREEN™

Slimquick Pure Keto Extra Strength has isolated the fat-burning component in green tea that speeds up your metabolism. It is called KetoGreen™ Green Tea and it has been shown in a published study to help overweight women lose up to 25 lbs versus dieting alone, in just 13 weeks.△*

△ A study has shown that overweight women using Slimquick Pure's key ingredient, along with a 1,350 calorie diet, lost 25 pounds vs. 8 pounds with diet alone in just 13 weeks.
When used as directed as part of your diet and exercise program.

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21





22    5.    Defendants' claims are misleading because none of the ingredients in
23 SlimQuick, individually or in combination, safely and effectively increase weight loss,
24 calorie burning, or fat oxidation.

25    6.    Further, Defendants representations that SlimQuick is "made with safe and
26 natural ingredients" and is "not harmful to our bodies" are false. SlimQuick contains a
27 dangerous amount of green tea extract, so consumption of SlimQuick causes liver injury
28 and even liver failure.

7.      Defendants' marketing and advertising of SlimQuick was intended to, and did, deceive Plaintiffs and class members into believing that the product could effectively increase weight loss, and metabolism and decrease appetite.

8.      Defendants engaged in a consistent, long-term campaign to fraudulently market SlimQuick as a safe and effective weight loss supplement.

9.      These fraudulent claims also violate the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. ("FDCA") and subject any individual manufacturing or selling SlimQuick to liability for the sale of an unapproved new drug.

10.     Defendants' misrepresentations and omissions, described in detail herein, mislead consumers into believing that SlimQuick can effectively increase weight loss and metabolism and decrease appetite. Plaintiffs purchased and used SlimQuick in reliance upon these claims.

11.     Plaintiffs used SlimQuick as directed, but the products failed to deliver upon the specific advertised claims.

12.     Defendants promote SlimQuick as providing benefits akin to prescription weight loss drugs, but SlimQuick cannot deliver the advertised benefits and is not safe and effective for its intended purposes.

13.     Defendants claim that SlimQuick is "made with safe and natural ingredients" and "not harmful to our bodies." These claims are false, as SlimQuick contains an undisclosed, but dangerous amount of green tea extract.

14.     Multiple studies have noted severe injuries caused by consumption of SlimQuick. One study reported "[s]ix cases of acute liver injury attributed to SLIMQUICK products."[1] "Three patients were hospitalized and one underwent successful liver transplantation." *Id*. The study concluded that "SLIMQUICK® products can lead to severe acute hepatocellular liver injury, which may result in transplantation." *Id*. Consumers have

---

[1]  Zheng EXet al. *Risk of Liver Injury Associated with Green Tea Extract in SLIMQUICK(®) Weight Loss Products: Results from the DILIN Prospective Study*. DRUG SAF. 2016 Aug;39(8):749-54.

CLASS ACTION COMPLAINT

also reported contracting jaundice, which is associated with liver injury, after using SlimQuick as directed.[2]

15.    This action is brought to remedy Defendants' unfair, deceptive, immoral, and unlawful conduct. On behalf of the class defined herein, Plaintiffs seek an order compelling Defendants to, *inter alia*: (1) cease marketing and selling SlimQuick with deceptive and unlawful claims; (2) conduct a corrective advertising campaign; (3) destroy all misleading and deceptive materials and products; (4) award Plaintiffs and the Class members damages, punitive damages, interest, and restitution; and (5) pay costs, expenses, and attorney fees.

## III. PARTIES

16.    Plaintiff Maria Nelson is a citizen of California and a resident of Riverside County who purchased SlimQuick Pure Extra Strength Keto Pills from a Walmart in San Jacinto for personal consumption.

17.    Plaintiff Michelle Garza is a citizen of California and a resident of Los Angeles County who purchased SlimQuick Pure Extra Strength Caplets and SlimQuick Pure Extra Strength Drink Mix from a Walmart in Los Angeles for personal consumption.

18.    Defendant Platinum US Distribution, Inc. d/b/a/ WellNX Life Sciences USA is a Delaware corporation with its principal place of business in Wilmington, Delaware. Platinum US Distribution, Inc. markets, distributes, and sells SlimQuick.

19.    Defendant WellNX Life Sciences, Inc. is a Canadian corporation with its principal place of business in Mississauga, Ontario. WellNX Life Sciences, Inc. markets, distributes, and sells SlimQuick.

20.    Defendant WellNX Life Sciences DR, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware. WellNX Life Sciences DR, Inc. markets, distributes, and sells SlimQuick.

21.    SlimQuick    is    sold    online    through    the    SlimQuick    website,

---

[2] Fox News, Weight-loss pill warning: 3 women tell their stories (October 24, 2015), available    at    www.foxnews.com/health/weight-loss-pill-warning-3-women-tell-their-stories.

CLASS ACTION COMPLAINT

www.myslimquick.com, which Defendants control, on Amazon, and at retail locations, such as Walmart. SlimQuick is available for purchase throughout California.

22.     During the class period, Defendants owned, manufactured, marketed, distributed, and sold SlimQuick.

## IV.     REGULATORY BACKGROUND REGARDING UNAPPROVED DRUGS.

23.     The

Dietary Supplement Health and Education Act (DSHEA) of 1994, which amended the Federal Food, Drug, and Cosmetic Act, transformed FDA's authority to regulate dietary supplements. Under DSHEA, FDA is not authorized to approve dietary supplements for safety and effectiveness before they are marketed. In fact, in many cases, firms can lawfully introduce dietary supplements to the market without even notifying FDA. Since DSHEA was enacted, the dietary supplement market has grown significantly. For example, the number of products has expanded nearly twenty times since 1994.[3]

24.     "The term 'drug' means . . . (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1).

25.     A "new drug" is any drug "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the condition prescribed, recommended, or suggested in the labeling thereof . . ." 21 U.S.C. § 321(p)(1).

26.     Pursuant to 21 U.S.C § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug . . ." without approval by the FDA.

27.     Further, 21 U.S.C. § 331(a) prohibits the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or

---

[3] U.S. Food & Drug Admin., Information for Consumers on Using Dietary Supplements (October 21, 2022), www.fda.gov/food/dietary-supplements/information-consumers-using-dietary-supplements.

cosmetic that is adulterated or misbranded."

28.    Pursuant to 21 U.S.C. § 352(f), drugs are required to have adequate instructions for safe use.

## V. <u>THE SALE OF UNAPPROVED DRUGS LIKE SLIMQUICK POSES A GRAVE DANGER TO PUBLIC HEALTH.</u>

29.    Unapproved "drugs pose significant risks to patients because they have not been reviewed by FDA for safety, effectiveness or quality."[4]

30.    "Without FDA review, there is no way to know if these drugs are safe and effective for their intended use, whether they are manufactured in a way that ensures consistent drug quality or whether their label is complete and accurate." *Id.*

31.    "Unapproved drugs have resulted in patient harm." *Id.*

32.    Further, unapproved drugs lack "labels and prescribing information that has" "been reviewed by FDA for accuracy and completeness."[5]

33.    Consumers using unapproved drugs also run the risk of "unexpected and undocumented safety concerns due to lack of rigorous pre- and postmarket safety surveillance." *Id.*

34.    Additionally, unapproved drugs lead consumers in need of medical treatment to forego medically proven therapies.

## VI. <u>THE PURPORTED ACTIVE INGREDIENT IN SLIMQUICK DOES NOT CAUSE WEIGHT LOSS.</u>

35.    The purported active ingredient in SlimQuick is green tea extract.

36.    Defendants claim that they have "isolated the fat burning components in green tea that speed up your metabolism better than any unhealthy chemical ingredient."

37.    However, studies show that green tea extract does not cause weight loss.

---

[4]    U.S. Food & Drug Admin., <u>Unapproved Drugs</u> (June 2, 2021), www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs.

[5] U.S. Food & Drug Admin., <u>Unapproved Drugs and Patient Harm</u> (June 2, 2021), www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs-and-patient-harm.

38.    A 2012 review of "RCTs of at least 12 weeks' duration comparing green tea preparations to a control in overweight or obese adults" concluded that "Green tea preparations appear to induce a small, statistically non-significant weight loss in overweight or obese adults. Because the amount of weight loss is small, it is not likely to be clinically important. Green tea had no significant effect on the maintenance of weight loss."[6]

39.    Another study similarly concluded that "the amount of weight loss produced by green tea preparations is unlikely to be clinically relevant."[7]

40.    A 2017 randomized, double blind trial evaluating overweight men taking green tea extract

demonstrate[d] that men who are obese and at high risk for prostate cancer should resort to effective weight management strategies to reduce obesity and not resort to ineffective measures such as taking supplements of green tea to reduce biomarkers of obesity. Changes in body mass index and abdominal obesity seen in other studies were potentially due to caffeine and not GTC.[8]

41.    Another randomized, double blind, placebo-controlled trial found "[t]here was no statistical difference in % reduction in [body weight], [body mass index], and [waist circumference] between the GTE and placebo groups."[9]

42.    Another study examining "whether green tea may improve weight

---

[6] Jurgens TM, Whelan AM, Killian L, Doucette S, Kirk S, Foy E. *Green tea for weight loss and weight maintenance in overweight or obese adults*. COCHRANE DATABASE OF SYSTEMATIC REVIEWS 2021, Issue 6. Art. No.: CD008650.

[7] Jurgens T, Whelan AM. *Can green tea preparations help with weight loss?* CAN PHARM J (OTT). 2014 May;147(3):159-60.

[8] Kumar N. B., et al. *Long-term supplementation of decaffeinated green tea extract does not modify body weight or abdominal obesity in a randomized trial of men at high risk for prostate cancer*. ONCOTARGET. 2017; 8: 99093-99103.

[9] Chung-Hua Hsu, et al., *Effect of green tea extract on obese women: A randomized, double-blind, placebo-controlled clinical trial*, Clinical Nutrition, Volume 27, Issue 3, 2008, 363-370.

maintenance by preventing or limiting weight regain after weight loss of 5 to 10 % in overweight and moderately obese subjects" concluded that "weight maintenance after 7.5% body-weight loss was not affected by green tea treatment."[10]

## VII. DEFENDANTS SELL MULTIPLE UNAPPROVED DRUGS IN A UNIFIED ILLEGAL SCHEME.

43.    Defendants market numerous "supplements" under the SlimQuick brand name with claims which suggest that SlimQuick can treat disease such as obesity and affect the structure or function of the human body by increasing weight loss, burning fat, and reducing appetite.

44.    These claims are misleading, as SlimQuick fails to deliver the advertised benefits. Further, these claims render SlimQuick a "drug" within the meaning of 21 U.S.C. § 321(g).

45.    However, Defendants failed to obtain FDA approval to market and distribute SlimQuick in violation 21 U.S.C. § 355 and Cal. Health & Safety Code §111550.

### A.    SlimQuick Pure Extra Strength Caplets

46.    During the Class Period, Defendants manufactured, advertised, and sold SlimQuick Pure Extra Strength Caplets in packaging bearing deceptive efficacy claims which suggest the product can mitigate, cure, or treat obesity and affect the structure and function of the human body by increasing weight loss, burning fat, and reducing appetite.

47.    Specifically, the SlimQuick Pure Extra Strength Caplets label claims that it "increases metabolism, reduces appetite, boosts energy," and "reduces excess water" and that consumers can "lose up to 11x the weight." It further claims that it "has been shown in a published study to help overweight individuals lose up to 11x more weight versus dieting alone." In truth, SlimQuick Pure Extra Strength Caplets cannot deliver the advertised benefits.

48.     In addition to being misleading, these claims render SlimQuick Pure Extra

---

[10] Kovacs EM, et al. *Effects of green tea on weight maintenance after body-weight loss.* Br J Nutr. 2004 Mar;91(3):431-7.

Strength Caplets a "drug" as defined by 21 U.S.C. § 321(g).

49.    Examples of the packaging of SlimQuick Pure Extra Strength Caplets are as follows:

 

50.    Further, during the Class Period, Defendants advertised SlimQuick Pure Extra Strength Caplets with claims that suggest the product can provide prescription weight loss drug benefits when in truth, SlimQuick Pure Extra Strength Caplets cannot deliver the advertised benefits.

51.    The SlimQuick Pure Extra Strength Caplets label, Defendants' website, and Defendants' Amazon page for SlimQuick Pure Extra Strength Caplets, all of which are controlled by Defendants, contained the following claims, which are both misleading and show that the product is intended to affect the structure and function of the body, and to cure, mitigate, treat, or prevent disease, during the Class Period:

- "SlimQuick"
- "Lose Up To 11x the Weight"
- "LOSE UP TO 25 LBS"

CLASS ACTION COMPLAINT

- "Slimquick Pure Extra Strength has isolated the fat burning component in a herbal extract that speeds up your metabolism."

- "Has been shown in a published study to help overweight individuals lose up to 11x more weight versus dieting alone, in just 12 weeks."

- "A study has shown that subjects using Slimquick Pure's key ingredient, along with a diet of 3 meals a day without snacking, lost 20.9 pounds vs 1.8 pounds in the placebo group following the same diet in 12 weeks."

- "increases metabolism"

- "reduces appetite"

- "reduces excess water"

- "natural ingredients to give us the purest formula, which is not harmful to our bodies"

- "Keeps you full for longer"

- "Made with safe and natural ingredients"

- "Helps reduce stress that can increase weight gain"

- "Supports hormones that help burn fat"

- "The active ingredients in the SLIMQUICK formula are backed by real clinical research that shows that they work to burn fat, reduce appetite and increase energy!"

- "In a clinical study, overweight women using a key ingredient in SLIMQUICK along with a 1,350-calorie diet lost an average of three times the weight compared to those who just followed the 1,350-calorie diet!"

- "In fact, these women lost an average of 25 pounds in just 13 weeks!"

- "It is really that easy!"

52.    These claims render SlimQuick Pure Extra Strength Caplets an unapproved drug pursuant to 21 U.S.C. § 321(g).

53.    Defendants' website, www.myslimquick.com, is **Exhibit 1**.

54.    The SlimQuick Pure Extra Strength Caplets webpage is **Exhibit 2**.

55.    Defendants failed to obtain FDA approval prior to marketing, distributing, and selling SlimQuick Pure Extra Strength Caplets.

13

56.    Further, these claims render the products "drugs" within the meaning of 21 U.S.C. § 321(g).

57.    However, Defendants failed to obtain FDA approval to market and distribute SlimQuick in violation 21 U.S.C. § 355.

**B.    <u>SlimQuick Keto Pills</u>**

58.    During the Class Period, Defendants manufactured, advertised, and sold SlimQuick Keto Pills, a "supplement," in packaging bearing deceptive efficacy claims which suggest the product can mitigate, cure, or treat obesity and affect the structure and function of the human body by increasing weight loss, burning fat, and reducing appetite.

59.    Specifically, the SlimQuick Keto Pills label claims that the product "increases metabolism, reduces appetite, boosts energy," and "reduces excess water." Defendants further claim that consumers can "lose up to 25 lbs!" and that the product "has been shown in a published study to help overweight women lose up to 25 lbs." In truth, SlimQuick Pure Extra Strength Keto Pills cannot deliver the advertised benefits.

60.    In addition to being misleading, these claims render SlimQuick Keto Pills a "drug" as defined by 21 U.S.C. § 321(g).

61.    Examples of the packaging of SlimQuick Keto Pills are as follows:



62.    Further, during the Class Period, Defendants advertised SlimQuick Keto Pills with claims that suggest the product can provide prescription weight loss drug benefits when in truth, SlimQuick Pure Extra Strength Caplets cannot deliver the advertised benefits.

63.    The SlimQuick Keto Pills label, Defendants' website, and Defendants' Amazon page for SlimQuick Keto Pills, all of which are controlled by Defendants, contained the following claims, which are both misleading and show the product is intended to affect the structure and function of the body, and to cure, mitigate, treat, or prevent disease, during the Class Period:

- "SlimQuick"
- "LOSE UP TO 11X THE WEIGHT"
- "LOSE UP TO 25 LBS"
- "the only extra strength dietary supplement designed specifically to help women sculpt their best bodies"
- "helps women attain their fitness resolution in less time"
- "reduces appetite"
- "reduces excess water"
- "boosts energy"
- "shown in a published study to help overweight women lose up to 25 lbs versus dieting alone, in just 13 weeks"
- "QUICK FAT BREAKDOWN"
- "The active ingredients in the SLIMQUICK formula are backed by real clinical research that shows that they work to burn fat, reduce appetite and increase energy!"
- "In a clinical study, overweight women using a key ingredient in SLIMQUICK along with a 1,350-calorie diet lost an average of three times the weight compared to those who just followed the 1,350-calorie diet!"
- "In fact, these women lost an average of 25 pounds in just 13 weeks!"
- "A study has shown that subjects using Slimquick Pure's key ingredient, along with a diet of 3 meals a day without snacking, lost 20.9 pounds vs 1.8 pounds in the placebo group following the same diet in 12 weeks."

64.     These claims render SlimQuick Keto Pills an unapproved drug pursuant to 21 U.S.C. § 321(g).

65.     The SlimQuick Keto Pills webpage is attached as **Exhibit 3**.

66.     Its Amazon page is attached as **Exhibit 4**.

67.     Defendants failed to obtain FDA approval prior to marketing, distributing, and selling SlimQuick Keto Pills.

CLASS ACTION COMPLAINT

### C.    SlimQuick Regular Strength

68.    During the Class Period, Defendants manufactured, advertised, and sold SlimQuick Regular Strength in packaging bearing deceptive efficacy claims which suggest it can mitigate, cure, or treat obesity and affect the structure and function of the human body by increasing weight loss, burning fat, and reducing appetite.

69.    Specifically, the label claims that it "increases metabolism, reduces appetite, boosts energy," and "reduces excess water" and that consumers can "lose 3x the weight." Defendants further claim that consumers can "lose up to 25 lbs!" and that the product "speeds up your metabolism" and "has been shown in a published study to help overweight women lose 3 times the weight."

70.    SlimQuick Regular Strength cannot deliver the advertised benefits.

71.    In addition to being misleading, these claims render SlimQuick Regular Strength a "drug" as defined by 21 U.S.C. § 321(g).

72.    Examples of the packaging of SlimQuick Regular Strength are as follows:




73.    Further, during the Class Period, Defendants advertised SlimQuick Regular

Strength with claims that suggest the product can provide prescription weight loss drug benefits when in truth, the product cannot deliver the advertised benefits.

74.    The SlimQuick Regular Strength label, Defendants' website, and Defendants' Amazon page, all of which are controlled by Defendants, contained the following claims, which are both misleading and show the product is intended to affect the structure and function of the body, and to cure, mitigate, treat, or prevent disease, during the Class Period:

- "SlimQuick"
- "LOSE UP TO 3X THE WEIGHT"
- "the only weight-loss supplement designed specifically to help women lose 3 times the weight"
- "weight loss designed for women"
- "increases metabolism"
- "reduces appetite"
- "reduces excess water"
- "boosts energy"
- "has been shown in a published study to help overweight women lose 3 times the weight."
- "designed to address the 6 physical reasons women have trouble losing weight"
- "speeds up your metabolism"
- "helps lipid metabolism and keeps you full for longer"
- "QUICK FAT BREAKDOWN"
- "The active ingredients in the SLIMQUICK formula are backed by real clinical research that shows that they work to burn fat, reduce appetite and increase energy!"
- "In a clinical study, overweight women using a key ingredient in SLIMQUICK along with a 1,350-calorie diet lost an average of three times the weight compared to those who just followed the 1,350-calorie diet!"

CLASS ACTION COMPLAINT

- "In fact, these women lost an average of 25 pounds in just 13 weeks!"

75. In addition to being misleading, these claims render it an unapproved drug pursuant to 21 U.S.C. § 321(g).

76. The SlimQuick Regular Strength webpage is attached hereto as **Exhibit 5**.

77. Its Amazon page is attached as **Exhibit 6**.

78. Defendants failed to obtain FDA approval prior to marketing, distributing, and selling SlimQuick Regular Strength.

**D.    SlimQuick Drink Mix**

79. During the Class Period, Defendants manufactured, advertised, and sold SlimQuick Drink Mix in packaging bearing deceptive efficacy claims which suggest the product can mitigate, cure, or treat obesity and affect the structure and function of the human body by increasing weight loss, burning fat, and reducing appetite.

80. Specifically, the label claims that it "increases metabolism, reduces appetite, boosts energy," and "reduces excess water" and that consumers can "lose up to 25 lbs!" Defendants further claim that the product "has been shown in a published study to help overweight women lose up to 25 lbs." In truth, SlimQuick Drink Mix cannot deliver the advertised benefits.

81. In addition to being misleading, these claims render SlimQuick Drink Mix a "drug" as defined by 21 U.S.C. § 321(g).

82. Examples of the packaging of SlimQuick Drink Mix are as follows:

CLASS ACTION COMPLAINT




83.     Further, during the Class Period, Defendants advertised SlimQuick Drink Mix with claims that suggest the product can provide prescription weight loss drug benefits when in truth, the product cannot deliver the advertised benefits.

84.     The SlimQuick Drink Mix label, Defendants' website, and Defendants' Amazon page, all of which are controlled by Defendants, contained the following claims, which are both misleading and show the product is intended to affect the structure and function of the body, and to cure, mitigate, treat, or prevent disease, during the Class Period:

- "LOSE UP TO 25 lbs"

- "has been shown in a published study to help overweight women lose up to 25 lbs"

- "speeds up your metabolism"

- "has been shown in a published clinical study to help overweight women lose 3 times the weight"

- "helps lipid metabolism and keeps you full for longer"

- "QUICK FAT BREAKDOWN"

85.    These claims render SlimQuick Drink Mix an unapproved drug pursuant to 21 U.S.C. § 321(g).

86.    The SlimQuick Drink Mix webpage is attached as **Exhibit 7**, and its Amazon page as **Exhibit 8**.

87.    Defendants failed to obtain FDA approval prior to marketing, distributing, and selling SlimQuick Drink Mix.

## VIII. DEFENDANTS' ADVERTISING FOR SLIMQUICK IS FALSE AND MISLEADING, RENDERING SLIMQUICK MISBRANDED.

88.    It is unlawful to manufacture or sell a drug that is misbranded. 21 U.S.C. § 331(a), (b), (c), & (g).

89.    A drug is misbranded "[i]f its labeling is false or misleading in any particular."[11] 21 U.S.C. § 352(a)(1). It is also misbranded if it fails to reveal material facts under 21 U.S.C. § 321(n).

90.    The SlimQuick efficacy representations equally render it misbranded pursuant under California Health & Safety Code § 110100 (incorporating FDA labeling regulations), § 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded."), § 111330 (drug label misbranded if false or misleading in any particular), and further violate Cal. Bus. & Prof. Code § 17200 (Unfair Competition Law "Fraudulent" Prong) § 17500 (False Advertising Law) and Cal. Civ. Code § 1750 (CLRA).

91.    SlimQuick claims to treat conditions not amenable to self-diagnosis. Directions are not written such that a layperson can safely use them. The label therefore lacks "adequate directions for use," rendering them misbranded under 21 U.S.C. §

---

[11] Under the FDCA, "'labeling' means all labels and other written, printed, or graphic matters (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m). This includes websites associated with the products." *See Sandoval v. Pharmacare US, Inc.*, 730 Fed. App'x 417, 420 (9th Cir. 2018).

352(f)(1). See also 21 C.F.R. § 201.5 ("'Adequate directions for use' means directions under which the layman can use a drug safely and for the purposes for which it is intended.").

92.     Plaintiffs used SlimQuick as directed, but it failed to deliver the advertised benefits.

### IX.      SLIMQUICK IS AN UNAPPROVED NEW DRUG.

93.     "The term 'drug' means . . . (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1).

94.      SlimQuick is a drug because it is advertised to treat obesity and to affect the structure of the human body by increasing metabolism and decreasing body fat.

95.     The claims on the product labels, corporate web pages, and Amazon pages for SlimQuick also render it an unapproved new drug.

96.     The FDA has determined that the following claims, which are similar to those Defendants make regarding SlimQuick, constitute "drug claims":

- "'Our natural blend of ingredients can benefit you by . . . [s]uppressing your appetite . . . [b]oosts your metabolism .. . [b]urn fat & calories . . . [i]ncrease energy levels . . .'" (**Exhibit 9**, FDA Warning Letter to Genesis Nutrition Ultra Slim );

- "'Benefits . . . appetite suppression . . . reduce bloating . . . burns fat . . . reduce inches . . .potentiates weight loss . . . improves metabolism'" (**Exhibit 9**, FDA Warning Letter to Genesis Nutrition Ultra Slim);

- "'It is a totally natural herbal supplement [ . . . ] that'" "'inhibits appetite, burns fat,'" "'accelerates metabolism'" "'and increase your energy.'" (**Exhibit 10**, Je Dois Lavoir LLC);

- "How does this capsule work? . . . Appetite Control . . . Accelerates metabolism . . . Increase your energy . . .Causes satiety . . . Burn fat'" (**Exhibit 10**, Je Dois Lavoir LLC);

97.     A "new drug" is any drug "not generally recognized, among experts qualified

by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the condition prescribed, recommended, or suggested in the labeling thereof . . . ." 21 U.S.C. § 321(p)(1). Here, SlimQuick is a "new drug" within the meaning of the FDCA because it is not generally recognized as safe and effective for its intended uses. See Title 21 of the Code of Federal Regulations, Chapter I, Subchapter D; 21 C.F.R. § 330.1.

98.    "No person shall introduce or deliver for introduction into interstate commerce any new drug . . ." without approval by the FDA. 21 U.S.C § 355(a); see also 21 U.S.C. § 331(d).

99.    Defendants promote SlimQuick, an "OTC drug product" with claims suggesting that it can provide benefits akin to those of prescription weight loss medications. However, SlimQuick is not a safe and effective weight loss treatments.

100.    Defendants have not received approval from the FDA to market, distribute, and sell SlimQuick.

101.    The sale of unapproved new drugs is illegal and dangerous. First, consumers risk purchasing and using a product that will endanger their health. Second, consumers risk purchasing a product that will not effectively treat their condition, forgoing actual treatment of that condition in lieu of an unapproved new drug which may not treat their condition. The FDA's regulatory regimen helps ensure that such products are kept away from consumers.

102.    Defendants' failure to comply with these regulations puts consumers at risk and gives it an unfair advantage over competitors that do commit the time and expense of complying with such necessary regulations.

103.    SlimQuick does not qualify for the reduced level of regulation applicable to certain nutrition supplement products. The labels, webpages, and marketing materials neither describe the role of any nutrient or dietary ingredient intended to affect the structure or function in humans, nor characterize the documented mechanism by which any nutrient or dietary ingredient acts to maintain such structure or function, nor describe general well-

being from consumption of any nutrient or dietary ingredient. 21 U.S.C. § 343(r)(6)(A).

104.    California similarly prohibits the sale of unapproved new drugs. Health & Safety Code § 111550.

## X.    SLIMQUICK IS DANGEROUS TO CONSUME.

105.    On MySlimQuick.com, Defendants claim that SlimQuick "contain[s] natural ingredients to give us the purest formula, which is not harmful to our bodies."

106.    This is false. SlimQuick contains a dangerous amount of green tea extract.

107.    Multiple studies have noted severe injuries caused by consumption of SlimQuick. One study reported "[s]ix cases of acute liver injury attributed to SLIMQUICK products."[12]

108.    "Three patients were hospitalized and one underwent successful liver transplantation." *Id.*

109.    Consumers have also reported contracting jaundice, which is associated with liver injury, after using SlimQuick as directed.[13]

110.    A nurse at Penn Presbyterian Medical Center in Philadelphia purchased SlimQuick after seeing a commercial that "really drew [her] in." The commercial claimed that SlimQuick was "the only weight loss supplement to help women lose up to 25 pounds." After taking SlimQuick for a couple weeks, "she started to notice that she was more tired than usual." It "kept getting worse, and eventually she felt fatigued all the time. Then a coworker noticed that her eyes had turned bright yellow, a symptom of a sick liver." She took, a blood test, which "found dangerously high levels of liver enzymes. Doctors diagnosed her with jaundice, acute hepatitis and an enlarged liver." *Id.*

111.    In another case report, a "52-year-old woman presented to the emergency

---

[12] Zheng EX, et al. Risk of *Liver Injury Associated with Green Tea Extract in SLIMQUICK(®) Weight Loss Products: Results from the DILIN Prospective Study*. Drug Saf. 2016 Aug;39(8):749-54.

[13] Fox News, Weight-loss pill warning: 3 women tell their stories (October 24, 2015), available at https://www.foxnews.com/health/weight-loss-pill-warning-3-women-tell-their-stories.

Class Action Complaint

department with one week of vomiting and progressive jaundice. On further questioning, the patient reported 2 days of ingesting the weight loss supplement SlimQuickTM." [14]

112.    "In the unlikely possibility that there was an autoimmune etiology to her acute liver injury, Prednisone 60 mg was initiated, but discontinued 2 days later due to worsening liver function. A day later, the patient's mental status began to deteriorate. The patient was expeditiously evaluated and listed for liver transplant. She underwent liver transplantation two days later." *Id.*

113.    The study concluded that the patient suffered "fulminant liver due to ingestion of SlimQuickTM. The major ingredient in SlimQuickTM is GTE. GTE is a common ingredient in several dietary supplements, some of which have been withdrawn from the market due to safety concern." *Id.*

114.    Likewise, the National Institute of Health has noted that "[t]here have been rare reports of clinically apparent liver injury in patients taking SLIMQUICK products, the majority of which had clinical features suggestive of green tea hepatotoxicity." [15]

115.    Thus, Defendants claim that SlimQuick "contain[s] natural ingredients" and is "not harmful to our bodies" is false.

## XI.    PLAINTIFFS' PURCHASES OF SLIMQUICK

116.    Plaintiff Maria Nelson repeatedly purchased SlimQuick Keto Pills from a Walmart in San Jacinto, California from 2023 to 2025.

117.    Plaintiff Michelle Garza purchased SlimQuick Extra Strength Caplets and SlimQuick Drink Mix from Walmart in Los Angeles in 2024 and 2025.

118.    In deciding to purchase SlimQuick, Plaintiffs relied on Defendants' deceptive

---

[14] Halegoua-De Marzio, et al. *SlimQuickTM- Associated Hepatotoxicity Resulting in Fulminant Liver Failure*: 1057. American Journal of Gastroenterology 108():p S315, October 2013.

[15] *LiverTox: Clinical and Research Information on Drug-Induced Liver Injury* [Internet]. Bethesda (MD): NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES; 2012-. Slimquick. (September 3, 2021). Available at www.ncbi.nlm.nih.gov/books/NBK548570/.

and unlawful efficacy claims and the natural assumption that supplements available for purchase at retail locations and online would be safe and effective and sold in compliance with state and federal regulations.

119.   Plaintiffs used SlimQuick as directed, but the product did not deliver the advertised benefits, nor any results at all.

120.   Because Plaintiffs expected these statements to be true and honest, but they were not, they did not receive the benefit of their purchases.

## XII. **RELIANCE AND INJURY**

121.   When purchasing SlimQuick, Plaintiffs were seeking products of particular qualities, including products that safely and effectively increase weight loss and metabolism and decrease body fat.

122.   Plaintiffs read and relied on, for their purchases, SlimQuick's packaging and Defendants' deceptive and unlawful efficacy claims described herein, which were substantial factors in Plaintiffs' purchases.

123.   Plaintiffs purchased SlimQuick believing it had the qualities they sought based on the products' deceptive labeling and the natural assumption that products sold in stores and online by large companies would deliver advertised benefits, such as those touted on the packaging of SlimQuick, and would be sold in compliance with state and federal regulations. The products were instead unsatisfactory to Plaintiffs for the reasons described herein.

124.   Plaintiffs purchased SlimQuick instead of competing products based on the false statements and misrepresentations described herein.

125.   Plaintiffs suffered economic injury when they purchased SlimQuick because it did not provide the advertised benefits, and they would not have purchased them absent Defendants' deceptive and unlawful conduct.

126.   SlimQuick was offered for sale in violation of California and federal law and has a value of $0 because it is illegal, ineffective, and dangerous.

127.   Plaintiffs would not have purchased SlimQuick had they known that it was

offered for sale in violation of California and federal law, entirely ineffective, and dangerous to consume.

128.   Plaintiffs would consider purchasing SlimQuick in the future if they could do so with assurance that the products (1) would deliver the advertised benefits and (2) were sold in compliance with all federal and California regulations.

## XIII. **DELAYED DISCOVERY**

129.   Plaintiff Maria Nelson did not discover that Defendants' behavior was deceptive, unfair, and unlawful until August 2025, when she learned that Defendants had been selling SlimQuick in violation of federal and California law. Until this time, she lacked knowledge regarding the facts of her claims against Defendants.

130.   Plaintiff Michelle Garza did not discover that Defendants' behavior was deceptive, unfair, and unlawful until November 2025, when she learned that Defendants had been selling SlimQuick in violation of federal and California law. Until this time, she lacked knowledge regarding the facts of her claims against Defendants.

131.   Plaintiffs are reasonably diligent consumers who exercised reasonable diligence in their purchase, use, and consumption of SlimQuick. Nevertheless, they would not have been able to discover Defendants' unfair and unlawful practices and lacked the means to discover them given that, like nearly all consumers, they are not experts on FDA regulations or California law pertaining to the marketing of drugs.

## XIV. **ADDITIONAL TOLLING ALLEGATIONS**

132.   At all relevant times, Defendants were aware that their marketing and sale of SlimQuick violated FDA regulations and California law.

133.   As supplement producers, Defendants had a continuing and affirmative moral and legal obligation to refrain from marketing and selling supplements with claims that violate FDA regulations and California law.

134.   Class members had no duty and no reason to inquire as to whether SlimQuick was marketed in violation of state and federal law. California, as a matter of economic regulation, places the burden of ensuring that supplements are safe, effective, and sold in

compliance with FDA regulations and California law, on their manufacturers, not the general public.

135.   Reasonable consumers, including Plaintiffs, had no reason to suspect Defendants' unfair competition and violations of federal and state law prohibiting the sale of unapproved and misbranded drugs.

136.   Defendants owed a special duty to Plaintiffs and all Class Members, akin to a fiduciary duty, which they violated by marketing SlimQuick with claims that suggest the product can affect the structure or function of the human body or can treat, mitigate, or cure disease without obtaining FDA approval to do so.

137.   During the entire Class Period, Defendants were aware that their conduct was oppressive and cruel, causing economic injury and discouraging consumers from seeking medically proven treatments, yet consciously continued these acts for years while knowing the extent of the harm they were causing. Equity and the public policy of California, embodied in its statutes, jointly demand, in such circumstance, that laches and tolling cannot apply in such a way to permit Defendants to continue to enjoy the fruits of their intentional, cruel, oppressive, and unlawful acts.

## XV. **DEFENDANTS' PRACTICES WERE "UNFAIR."**

138.   Defendants' practices as described herein are "unfair" within the meaning of the California Unfair Competition Law because their conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers, and the utility of this conduct to Defendants does not outweigh the gravity of the harm to Defendants' victims.

139.   In particular, while Defendants' use of fraudulent advertising and unlawful drug claims to sell an ineffective product may have had some utility to Defendants in that it allows them to realize higher profit margins than if they did not use fraudulent and unlawful advertising tactics, this utility is small and far outweighed by the gravity of the economic harm Defendants inflict upon consumers. Further, the injury to consumers from Defendants' practices is substantial, not outweighed by benefits to consumers or competition, and not an injury that consumers themselves could reasonably have avoided.

## XVI.  **DEFENDANTS' PRACTICES WERE "UNLAWFUL."**

140.   Defendants' practices as described herein are "unlawful" within the meaning of the California Unfair Competition Law because the marketing, sale, and distribution of SlimQuick violates the California's Sherman Food, Drug, and Cosmetic Law, including federal provisions that have been adopted by California

- **Health & Safety Code § 110100** *et seq.*, which adopts all FDA labeling regulations as state regulations;

- **Health & Safety Code § 111330**, "Any drug or device is misbranded if its labeling is false or misleading in any particular.";

- **Health & Safety Code § 110398**, "It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.";

- **Health & Safety Code § 111440**, "It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is misbranded.";

- **Health & Safety Code § 111445**, "It is unlawful for any person to misbrand any drug or device.";

- **Health & Safety Code § 111450**, "It is unlawful for any person to receive in commerce any drug or device that is misbranded or to deliver or proffer for delivery any drug or device.";

- **Health & Safety Code § 111550**, prohibiting sale of new drugs unless approved under 21 U.S.C. § 355;

- **Civil Code § 1770(a)**, prohibiting misleading practices in relation to the sale of goods;

- **Bus. & Prof. Code § 17500** *et seq.*, prohibiting false or misleading advertising;

- **Bus. & Prof. Code § 17200** *et seq.*, prohibiting fraudulent, unfair, and unlawful business activity.

- **21 U.S.C. § 331(a)**, prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded";

- **21 U.S.C. § 331(b)**, prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce";

29

- **21 U.S.C. § 352(f)(1)**, requiring drugs to have adequate directions for use; and

- **21 U.S.C. § 355(a)**, prohibiting the sale of unapproved new drugs.

141.   The fraudulent marketing and advertising of SlimQuick constitutes a violation of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

142.   Defendants' unlawful acts allowed them to sell more units of SlimQuick than they would have otherwise, and at a higher price and higher margin.

143.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and requiring Defendants to commence a corrective advertising campaign.

144.   Plaintiffs also seek an order for the disgorgement and restitution of all revenue received by Defendants from the sale of SlimQuick and have no adequate remedy at law.

## XVII. CLASS ACTION ALLEGATIONS

145.   Plaintiffs bring this action on behalf of themselves, and all others similarly situated (the "Class"), excluding Defendants' officers, directors, and employees, and the Court, its officers and their families.

146.   The Class is defined as:

All residents and citizens of California who purchased SlimQuick in California for their own personal or household use, and not for resale, from January 1, 2019 to the present.

147.   Common questions include:

a. Whether Defendants communicated efficacy messages through SlimQuick's labeling, packaging, website, and Amazon page;

b. Whether those messages were material, or likely to be material, to a reasonable consumer;

c. Whether those messages were false, at variance with the truth, misleading, likely to deceive, and/or had the capacity to deceive the public and/or a reasonable consumer;

d. Whether Defendants fraudulently omitted material information in advertising SlimQuick as safe and effective;

CLASS ACTION COMPLAINT

e.  Whether Defendants sold and distributed SlimQuick to the public in misleading packaging that was likely to deceive the public;

f.  Whether Defendants' advertising for SlimQuick violated the CLRA and False Advertising Law;

g.  Whether Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers;

h.  Whether Defendants' conduct violated public policy as declared by specific constitutional, statutory, or regulatory provisions;

i.  Whether the injury to consumers from Defendants' practices is substantial;

j.  Whether Defendants' conduct constituted a violation of the unfair prong of California's Unfair Competition Law;

k.  Whether Defendants' conduct constituted a violation of the unlawful prong of California's Unfair Competition Law;

l.  Whether Defendants' conduct constituted a violation of the fraudulent prong of California's Unfair Competition Law;

m. Whether the slight utility Defendants realized as a result of their conduct outweighs the gravity of the harm the conduct caused to their victims;

n.  Whether the injury to consumers from Defendants' practices is outweighed by benefits to consumers or competition;

o.  Whether Class members are entitled to restitution and/or damages;

p.  Whether Class members are entitled to an injunction and, if so, its terms; and

q.  Whether Class members are entitled to any further relief.

148.  Plaintiffs will fairly and adequately protect the interests of the Class, have no interests that are incompatible with the interests of the Class, and have retained counsel competent and experienced in class litigation.

149.  The Class is sufficiently numerous, as it includes thousands of individuals who purchased SlimQuick in the United States during the Class Period.

150.  Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small, as little as $20 for some Class members. Absent the availability of class action procedures, it would be infeasible

1  for Class members to redress the wrong done to them.

2  151.   Questions of law and fact common to the Class predominate over any

3  questions affecting only individual members.

### CAUSES OF ACTION

### First Cause of Action

### Unfair Competition Law, Unlawful Prong

### Bus. & Prof. Code §§ 17200, *et seq*.

8  152.   The acts, omissions, misrepresentations, practices, and non-disclosures of

9  Defendants as alleged herein constitute "unlawful" business acts and practices in that

10  Defendants' conduct violates the California False Advertising Law, the California

11  Sherman Law, and the California Consumer Legal Remedies Act.

12  153.   Defendants leveraged their deception to induce Plaintiffs and members of the

13  Class to purchase products that were of lesser value and quality than advertised.

14  154.   The fraudulent marketing of SlimQuick described herein constitutes a

15  violation of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong

16  of the UCL.

17  155.   Had Plaintiffs known that SlimQuick was entirely ineffective, offered for sale

18  in violation of California and federal regulations, and dangerous to consume, Plaintiffs

19  would not have purchased it.

20  156.   Plaintiffs suffered injury in fact and lost money or property as a result of

21  Defendants' deceptive advertising: they were denied the benefit of the bargain when they

22  decided to purchase SlimQuick over competing products, which are legal, less expensive,

23  and do not make misleading or false drug claims on their packaging.

24  157.   Defendants' unlawful acts allowed them to sell more units of SlimQuick than

25  they would have otherwise, and at a higher price, and higher margin.

26  158.   Had Plaintiffs been aware of Defendants' false and misleading advertising

27  tactics, they would not have purchased SlimQuick, and had Defendants not advertised

28  SlimQuick in a fraudulent manner, Plaintiffs would have paid less for it.

159.   In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices; requiring Defendants to commence a corrective advertising campaign; and awarding the class restitution of all monies Defendants obtained from the sale of the Extenze Products. Plaintiffs have no adequate remedy at law.

**Second Cause of Action**

**Unfair Competition Law, Fraudulent Prong**

**Bus. & Prof. Code §§ 17200, *et seq*.**

160.   Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

161.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute "fraudulent" business acts and practices in that Defendants' conduct has a likelihood, capacity, or tendency to deceive Plaintiffs, the Class, and the general public.

162.   Defendants leveraged their deception to induce Plaintiffs and members of the Class to purchase products that were of lesser value and quality than advertised.

163.   Plaintiffs suffered injury in fact and lost money or property as a result of Defendants' deceptive advertising: they were denied the benefit of the bargain when they decided to purchase SlimQuick over competing products, which are legal, less expensive, and do not make misleading or false drug claims on their packaging.

164.   Had Plaintiffs been aware of Defendants' false and misleading advertising tactics, they would not have purchased SlimQuick, and had Defendants not advertised SlimQuick in a fraudulent manner, Plaintiffs would have paid less for it.

165.   In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices, requiring Defendants to commence a corrective advertising campaign, and awarding the class restitution of all monies Defendants obtained from the sale of SlimQuick. Plaintiffs have no adequate remedy at law.

## **Third Cause of Action**

### **Unfair Competition Law, Unfair Prong**

### **Bus. & Prof. Code §§ 17200, *et seq*.**

166.   Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

167.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute "unfair" business acts and practices because:

- Defendants' conduct is immoral, unethical, unscrupulous, and offends public policy;

- the gravity of Defendants' conduct outweighs any conceivable benefit of such conduct; and

- the injury to consumers caused by Defendants' conduct is substantial, not outweighed by any countervailing benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided.

168.   In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices; requiring Defendants to commence a corrective advertising campaign; and awarding the class restitution of all monies Defendants obtained from the sale of SlimQuick. Plaintiffs have no adequate remedy at law.

### **Fourth Cause of Action**

### **False Advertising Law**

### **Bus. & Prof. Code §§ 17500, *et seq*.**

169.   In violation of Cal. Bus. & Prof. Code §§ 17500 *et seq*., the advertisements, labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and use of SlimQuick without the knowledge that the product makes misleading efficacy claims.

170.   Defendants knew and reasonably should have known that the claims made on SlimQuick's label, packaging, webpages, and Amazon pages were untrue and misleading.

171.   As a result, Plaintiffs, the Class, and the general public are entitled to

injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

172.   Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices; requiring Defendants to commence a corrective advertising campaign; awarding Plaintiffs and the class restitution of all monies from the sale of SlimQuick in an amount of $5 million or a greater amount to be proven at trial, actual and punitive damages, and interest to Plaintiffs, an incentive award to Plaintiffs in conjunction with a class award or injunction, and for attorney fees and costs to be awarded by the Court in accordance with applicable law, including the Private Attorney General Statute.

### Fifth Cause of Action

### Consumer Legal Remedies Act

### Civil Code §§ 1750, *et seq*.

173.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

174.   Defendants' policies, acts and practices were designed to, and did, result in the purchase and use of SlimQuick for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

- **Civil Code § 1770(a)(5),** representing that goods have characteristics, uses, or benefits which they do not have;

- **Civil Code § 1770(a)(7),** representing that goods are of a particular standard, quality, or grade if they are of another;

- **Civil Code § 1770(a)(9)**, advertising goods with intent not to sell them as advertised; and

- **Civil Code § 1770(a)(16),** representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

175.   As a result, Plaintiffs, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds

by which Defendants were unjustly enriched.

176.   As a further result, Plaintiffs and the Class have suffered damages, and because the conduct was deliberate, immoral, oppressive, made with malice and contrary to public policy, they are entitled to punitive or exemplary damages.

177.   Pursuant to section 1782 *et seq*. of the CLRA, Plaintiffs notified Defendants in writing by certified mail of the particular violations of § 1770 of the Act as to SlimQuick and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.

178.   Defendants received Plaintiffs' written notice.

## **PRAYER FOR RELIEF**

179.   WHEREFORE, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Defendants as follows:

a) An order confirming that this class action is properly maintainable as a class action as defined above, appointing Plaintiffs Maria Nelson and Michelle Garza and their undersigned counsel to represent the Class, and requiring Defendants to bear the cost of class notice;

b) An order requiring Defendants pay $500 in restitution, damages, and interest to each Plaintiff;

c) An order requiring Defendants to pay $5 million or a greater amount to be proven at trial in restitution to Class members, and $10,000 to each Plaintiff as an incentive award, or such greater amount the Court deems fair and reasonable;

d) An order requiring Defendants to disgorge any benefits received from Plaintiffs and the Class and their unjust enrichment realized as a result of its improper and misleading advertising, marketing, sale, and distribution of SlimQuick;

e) An order awarding Plaintiffs and the Class damages and punitive damages;

f) An Order declaring the conduct complained of herein violates the Unfair Competition Law;

g) An order requiring Defendants to cease and desist their deceptive,

CLASS ACTION COMPLAINT

unconscionable, fraudulent, and unlawful practices;

h) An order requiring Defendants to engage in a corrective advertising campaign;

i) An award of prejudgment and post judgment interest;

j) An award of attorney fees and costs of $500,000, or such greater amount the Court awards as fair and reasonable; and

k) Such other and further relief as this Court may deem just, equitable or proper.

## XVIII. <u>NO JURY DEMAND</u>

Plaintiffs do not demand a jury trial.

DATED: February 4, 2026                    Respectfully Submitted,

<u>s/ Gregory S. Weston</u>
**THE WESTON FIRM**
GREGORY S. WESTON

**<u>Counsel for Plaintiffs</u>**

CLASS ACTION COMPLAINT